# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### March 27, 2001 Session

## CRAIG TATMAN v.
## FORT SANDERS REGIONAL MEDICAL CENTER

**Appeal from the Circuit Court for Knox County**
**No. 3-596-98    Wheeler A. Rosenbalm, Judge**

**FILED APRIL 16, 2001**

**No. E2000-02163-COA-R3-CV**

---

Craig Tatman ("Plaintiff"), a devout Jehovah's Witness, underwent heart surgery at Fort Sanders Regional Medical Center ("Defendant"). Prior to the surgery, the attending physician and Defendant were specifically informed that Plaintiff was not to receive any blood or blood products. While Plaintiff was recovering from the surgery, he experienced a dramatic decrease in blood pressure. The attending critical care nurse forgot that Plaintiff was a Jehovah's Witness and administered Protenate, a protein fraction derived from human plasma. This was contrary to Plaintiff's religious tenets. At trial, Defendant admitted that a medical battery had taken place. The only issue presented to the jury was compensatory damages resulting from the medical battery. No jury instruction was requested or given regarding nominal damages. The jury awarded no compensatory damages. Plaintiff filed a motion requesting an additur or a new trial. Plaintiff's motion was denied, and Plaintiff appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgment of the Circuit Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and CHARLES D. SUSANO, JR., J., joined.

C. Philip Carter and Roger D. Hyman, Knoxville, Tennessee, for the Appellant Craig Tatman.

F. Michael Fitzpatrick and Chris Cain, Knoxville, Tennessee, for the Appellee Fort Sanders Regional Medical Center.

## OPINION

## <u>Background</u>

This appeal by Craig Tatman ("Plaintiff") challenges the adequacy of a jury verdict for zero dollars ($0.00) in compensatory damages. This verdict was returned after the Trial Court directed a verdict in favor of Plaintiff on the issue of liability on his medical battery claim against Fort Sanders Regional Medical Center ("Defendant").

The facts giving rise to this lawsuit are largely undisputed. Plaintiff suffered from a congenital condition known as aortic insufficiency which had been asymptomatic for several years. In 1997, Plaintiff's condition began to deteriorate to the point where surgery eventually would be required. Plaintiff is a member of the Jehovah's Witness faith. Because of his faith, Plaintiff refuses to receive blood or blood products during medical treatment. Plaintiff sought the services of Dr. Michael Maggart, a cardiovascular surgeon who enjoys a good reputation among the members of the Jehovah's Witness faith as a physician who is familiar with and respectful of their religious mandates. On September 29, 1997, aortic valve replacement surgery was performed on Plaintiff by Dr. Maggart. Prior to the surgery, Plaintiff informed Dr. Maggart and Defendant of his religious tenets and the fact that he could not be given blood or blood products. Because of his religious beliefs, Plaintiff and his wife were required to sign a release titled "Refusal to Permit Blood Transfusion" which released Defendant, any attending physician, and hospital personnel from any liability arising from Plaintiff's refusal of blood or blood products.

Dr. Maggart successfully performed the surgical operation without the use of blood or blood products. Shortly after surgery, Plaintiff, while still unconscious from the procedure, experienced a significant drop in blood pressure from 141/97 to 56/36. In an attempt to stabilize Plaintiff's blood pressure, he was given Protenate[1] by Brenda Harris ("Harris"), a critical care nurse. Protenate is a blood product and contains a 5% protein fraction derived from human plasma. After receiving the Protenate, Plaintiff's blood pressure gradually increased to 130/77. Harris admitted that she had been informed prior to administering the Protenate that Plaintiff was a Jehovah's Witness and that he refused transfusions or the administration of blood products. When Plaintiff's blood pressure dropped, Harris forgot these instructions and administered the Protenate.[2] Harris testified that in administering the Protenate, she was following her automatic response as a nurse to the drop in blood pressure. Other substances which did not contain blood products were available to elevate Plaintiff's blood pressure, such as saline.

---

[1] Throughout the record, the medication administered to Plaintiff is referred to as both Protenate and Plasmanate. For the sake of consistency, we will refer to it as Protenate.

[2] Plaintiff testified that while administration of whole blood or red blood cells is definitely forbidden, it is a matter of personal choice among members of the Jehovah's Witness faith as to whether or not they will accept the administration of protein fractions during medical procedures. The facts are undisputed, however, that Plaintiff's personal belief prohibited the use of any protein fraction such as Protenate.

When Plaintiff's wife, Mrs. Tatman, visited him shortly after the surgery, she noticed the Protenate bag and inquired of Harris if that was a blood product. At this point, Harris realized what had happened. Harris admitted to Mrs. Tatman that it was indeed a blood product. Mrs. Tatman understandably became upset. Harris apologized for what happened and informed Mrs. Tatman that she had made a mistake. Harris testified at trial that she did not intend to do any harm to Plaintiff or to demean his religious beliefs, and this was not disputed by Plaintiff.

While Plaintiff was administered Protenate against his religious beliefs, no action was taken against Plaintiff by the Kingdom Hall he attended or the Jehovah's Witnesses national organization. In fact, Plaintiff was told that it had been determined that he had done everything he could to prevent this incident from happening. Plaintiff did not seek counseling from a psychiatrist, psychologist, or licensed counselor as a result of this incident. Plaintiff returned to work full-time after recovering from the surgery. Since the surgery, Plaintiff and his wife vacationed in the Carribean and still engaged in the same recreational activities as they enjoyed before the surgery. Mrs. Tatman testified that Plaintiff told her that he had prayed about what happened and had forgiven Harris.

Plaintiff testified that when he was told by his wife that he had received a blood product, he was shocked. This later turned to pure anger. He felt like he had been taken advantage of when this occurred while he was unconscious. Prior to trial, Plaintiff had not received an apology from Harris or anyone else connected with Defendant. Plaintiff testified that his goal in bringing the lawsuit was to make Defendant responsible for what was done so it could improve its procedures to make sure it did not happen again. Plaintiff testified that he thinks about what happened at the hospital every day and is still angry. Plaintiff admitted that he did not seek any professional counseling and he did not think "it is that bad." Plaintiff originally believed his relationship with God had been ruined, and he sought assistance with this from fellow members of his faith. Plaintiff has prayed about what happened and has forgiven Harris and believes that God has forgiven him as well. Plaintiff testified that his marriage has grown stronger since he was given the blood product at the Defendant Hospital. Plaintiff did not miss any work or incur any medical bills as a result of receiving the Protenate. Approximately one year after the incident giving rise to this lawsuit took place, Plaintiff returned to Defendant Hospital and underwent nasal surgery.

In his Complaint, Plaintiff sought a judgment against Defendant in the amount of $500,000.00. While Defendant initially denied any liability to Plaintiff, approximately five days before trial, Defendant amended its answer to admit that a medical battery had occurred. Defendant continued to deny that Plaintiff had suffered any damages. Plaintiff then amended his Complaint seeking an additional $500,000.00 in punitive damages.

Prior to trial, the parties' attorney's presented the Trial Court with arguments as to the damages sought to be recovered by Plaintiff and were discussing the specific tenets of the Jehovah's Witness faith. During the course of the discussion, the following discourse occurred between the Trial Court and one of Plaintiff's attorneys:

THE COURT: There is no question there is a medical battery here, they admit that, but the question is what kind of harm was caused by that.

MR. HYMAN: Well, it is substantial harm to Jehovah's Witnesses.

THE COURT: Well, what is there –

MR. HYMAN: And in particular –

THE COURT: – to show that there is substantial harm? I mean –

MR. HYMAN: Well, we will have proof of that.

THE COURT: He was, shall we say, loosely, touched in a way that he didn't permit. That is a battery. You know, but what kind of harm has he suffered? Now, he may be entitled to nominal damages for that, but he has got to prove everything else. . . .

Based on this discussion, it is clear that the potential for a recovery of nominal damages was put before counsel for Plaintiff. After the proof had been presented, and before the jury had been charged, the following discussion occurred between Plaintiff's counsel and the Trial Court:

THE COURT: Well, of course, we have got no proof here of physical injury, right, no proof of medical expenses –

MR. HYMAN: We –

THE COURT: – no proof of lost wages, got no proof of impairment of, of capacity to earn.

MR. HYMAN: We have only proof of a physical invasion of his body as unconsented to.

THE COURT: Compensation for the physical invasion of his privacy and any insult, anguish, and emotional distress that he suffered –

MR. HYMAN: Yes.

THE COURT: – as a result there?

-4-

MR. HYMAN: Yes. That is the charge. As we don't have unliquidated damages, so it is up to the jury.

At the close of Plaintiff's proof, Defendant moved for a directed verdict on the issue of damages. The Trial Court granted the motion with respect to punitive damages, but otherwise overruled the motion. At the close of Defendant's proof, Plaintiff moved for a directed verdict on the issue of liability, "leaving nothing but damages for the jury to consider." The Trial Court granted the motion, and then, in accordance with the previous discussion, indicated to counsel that the jury charge would be along the following lines:

> THE COURT: I think I tell the jury that the defendant has admitted that a medical battery was committed upon the plaintiff, and the issue that they are to decide is what sum of money, if any, the plaintiff is entitled to recover as compensatory damages for that battery, and that in this case in arriving at the amount of such damages, if any, they are to consider any harm suffered by the plaintiff as a result of any physical invasion of his right to privacy in his body, and any insult, anguish, or emotional distress established by him by a preponderance of the evidence, so forth. There will be more, but that is the gist . . .

After closing arguments, the Trial Court instructed the jury on compensatory damages. As Defendant had been granted a directed verdict on the issue of punitive damages, no instruction on punitive damages was given. No jury instruction was requested by Plaintiff on nominal damages. Indeed, the potential for nominal damages was never brought up again after being mentioned by the Trial Court at the beginning of the trial. After charging the jury, the Trial Court specifically gave the parties the opportunity to object to the instructions that had been given or to submit any other requests. Neither party objected to the instructions or requested any additional instructions.

The jury deliberated and eventually returned a verdict for compensatory damages in the amount of $0.00. The Trial Court entered judgment on the verdict on June 9, 2000. On June 22, 2000, Plaintiff filed a Motion for an Additur or in the Alternative a New Trial. In that motion, Plaintiff claimed that the "jury failed to award the Plaintiff at least nominal damages, which failure conflicts with the undisputed facts of this case, and with established principles of Tennessee law." Plaintiff requested the Trial Court to suggest an appropriate additur or grant Plaintiff a new trial. Plaintiff did not challenge the jury instructions in this motion. On July 31, 2000, Plaintiff's motion was denied by the Trial Court. On August 28, 20000, Plaintiff filed a Notice of Appeal.

## Discussion

Acting as the thirteenth juror, a trial court is empowered to set aside a jury verdict and order a new trial. If a trial court determines that the amount of the verdict is excessive or inadequate,

in lieu of granting a new trial it may suggest a remittitur or an additur. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 718 (Tenn. Ct. App. 1999). This procedure avoids the expense and delay of conducting a new trial. *Id.*

> However, when a trial court approves a jury verdict, appellate courts may only review the record to determine whether it contains material evidence to support the jury's verdict. *See* Tenn. R. App. P. 13(d); *Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822, 823 (Tenn. 1994); *Whitaker v. Harmon*, 879 S.W.2d 865, 867 (Tenn. Ct. App. 1994). Appellate courts do not reweigh the evidence and consider where the preponderance lies. Instead, they determine whether there is any material evidence to support the verdict, and, if there is, they must affirm the judgment. *See Reynolds v. Ozark Motor Lines, Inc.,* 887 S.W.2d at 823; *Pullen v. Textron, Inc.*, 845 S.W.2d 777, 780 (Tenn. Ct. App. 1992).

> The jury bears primary responsibility for awarding damages in a personal injury action, followed closely by the trial court in its role as thirteenth juror. *See Coffey v. Fayette Tubular Products*, 929 S.W.2d 326, 328 (Tenn. 1996); *Sholodge Franchise Sys., Inc. v. McKibbon Bros., Inc.*, 919 S.W.2d at 41. When a trial court approves a verdict awarding damages in a personal injury action, our review is subject to the rule that if there is any material evidence to support the jury's award, it should not be disturbed. *See Hunter v. Burke*, 958 S.W.2d 751, 757 (Tenn. Ct. App. 1997).

*Overstreet*, 4 S.W.3d at 718.

As stated previously, in Plaintiff's Motion for an Additur or in the Alternative a New Trial, Plaintiff claimed simply that there was error because the jury failed to award at least nominal damages. It is unclear whether Plaintiff is claiming that nominal damages should have been awarded since no compensatory damages were awarded, or whether he is arguing that at least minimal compensatory damages should have been awarded. Plaintiff makes both arguments in his brief. Defendant argues that the only issue presented by Plaintiff on appeal is whether the jury erred in not awarding nominal damages. Defendant further argues that the adequacy of the award for $0.00 in compensatory damages has not been properly preserved for appeal.

Tenn. R. App. P. 3(e) provides, in relevant part, that:

[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the

case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived. . . .

As recently set forth by our Supreme Court, when an appellate court reviews under Rule 3(e) a motion for a new trial, the motion should be viewed in a light most favorable to the appellant, and the appellate court should resolve any doubt in favor of preserving the issue. *Fahey v. Eldridge Auto Sales, Inc.*, No. M1999-00500-SC-R11-CV (Tenn. S. Ct., March 22, 2001). The *Fahey* Court further instructed appellate courts not to "lightly dismiss an issue on appeal under a strict or technical application of Rule 3(e)." *Id.* Viewing Plaintiff's motion in a light most favorable to him, we conclude that both issues have been properly preserved for review.

First, we will address whether Plaintiff was entitled to an additur or a new trial because the jury did not award nominal damages. The purpose of nominal damages is to recognize a legal right when no actual damages have been proven. *See*, *e.g.*, *Killian v. Tabor Construction, Inc.*, No. 03A01-9803-CH-00106 (Tenn. Ct App. Aug. 19, 1998). We will assume, without deciding, that at the very least Plaintiff was entitled to nominal damages since no compensatory damages were proven based on the jury's verdict. Defendant argues that even if Plaintiff was entitled to nominal damages, Plaintiff did not request a jury instruction on nominal damages and, therefore, waived this issue. We agree. As set forth above, the Trial Court pointed out to Plaintiff's counsel that Plaintiff may be entitled to nominal damages. Nevertheless, compensatory damages were the only form of damages for which Plaintiff's counsel sought a jury instruction. Perhaps this was a tactical decision in hopes that the jury would award greater damages if an award of nominal damages was not a possibility. Regardless of the reason why no instruction on nominal damages was asked for, the fact remains that it was not and no objection to this omission was made when counsel was specifically given the opportunity to do so or in Plaintiff's motion for new trial. "A party cannot allege error for omissions in the charge without submitting a request setting forth the correct instructions." *Jones v. Tennessee Farmers Mutual Insurance Co.*, 896 S.W.2d 553, 556 (Tenn. Ct. App. 1994). In *Rule v. Empire Gas Corp.*, 563 S.W.2d 551, 554 (Tenn. 1978), our Supreme Court held that notwithstanding the language of Rule 51.02 of the Tenn R. Civ. P., a party has a duty to point out to the trial court any omission in the jury charge. Specifically, the Court stated:

We hold that Rule 51.02 of the Tennessee Rules of Civil Procedure has not abolished or altered the rule announced in the Provence [v. Williams, 62 Tenn. App 371, 462 S.W.2d 885 (1970)] and Holmes [v. American Bakeries Co., 62 Tenn. App. 601, 466 S.W.2d 502 (1970)] cases . . . that in order to predicate error upon an alleged omission in the instructions given to the jury by the trial judge he must have pointed out such omission to the trial judge at trial by an appropriate request for instruction.

More importantly, Plaintiff has never objected to the jury charge as given, even though it did not include a charge on nominal damages. Since the jury was not instructed to award

nominal damages in the event no compensatory damages were proven, there can be no error when the jury did not make such an award. We affirm, on this issue, the Trial Court's denial of Plaintiff's Motion for an Additur or in the Alternative a New Trial.

The second issue is whether the Trial Court erred in not suggesting an additur or granting a new trial since the jury failed to award any compensatory damages.[3] Since the Trial Court approved the verdict, our function is to determine if there is any material evidence to support the jury's award of $0.00 in compensatory damages. We cannot reweigh the evidence. Plaintiff testified that he lost no work and incurred no medical bills as a result of receiving the Protenate. He did not seek any professional counseling because of the incident. He has returned to full-time employment and continues to engage in the same recreational activities as he did before the incident. Plaintiff testified that he has forgiven Harris, and he believes that God has forgiven him. Also, the Kingdom Hall Plaintiff attends determined that Plaintiff had done nothing wrong and no action was taken against Plaintiff by the Jehovah's Witness national organization. Upon review of the record before us, there is material evidence to support the jury's verdict.

In reaching our conclusion, we note that there is no doubt that Plaintiff's religious beliefs are vital to him and strongly held. The jury was asked to determine only if Plaintiff was entitled to any compensatory damages given his undisputed religious beliefs, the incident of September 29, 1997, and its impact on him. The jury did this. The Trial Court approved the verdict. The record contains material evidence to support the verdict. Therefore, we must, and do, affirm.

## Conclusion

The judgment is affirmed. This matter is remanded to the Trial Court for further action as necessary, if any, consistent with this opinion. Costs of this appeal are taxed to Craig Tatman and his surety.

_____

D. MICHAEL SWINEY

---

[3] As set forth *supra*, nominal damages are awarded to recognize a legal right when no actual damages have been proven. Thus, a party's entitlement to nominal damages does not equate to an entitlement to minimal compensatory damages.